**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

---

Civil Action No. 23-1558

K.A., Plaintiff

v.

MICHELLE BARNES, Executive
Director of Colorado Department of
Human Services, in her official capacity,
ARAPAHOE COUNTY DEPARTMENT
OF HUMAN SERVICES, DIVISION OF
CHILD AND ADULT PROTECTION
SERVICES, MICHELLE DOSSEY, and
Division Manager of the Arapahoe
County Department of Human Services,
Division of Child & Adult Protection
Services, in her official capacity ,
Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff, K.A., a Colorado mother, by and through her attorneys, Suzanne Taheri and

Kristine L. Brown, hereby brings this action against Defendants Michelle Barnes, Executive

Director of Colorado Department of Human Services, in her official capacity, Arapahoe County

Department of Human Services, and Division of Child and Adult Protection Services, Michelle

Dosey, Division Manager of the Arapahoe County Department of Human Services, Division of

Child & Adult Protection Services, in her official capacity.

## INTRODUCTION

In a tangled saga that would stretch from 2017 to 2023, Defendants' pattern of intentional unconstitutional actions left Plaintiff, bankrupt, incarcerated, and devastated by the permanent termination of her parental rights. The Defendants ("County" or "Department") tangled her in court orders, false accusations, discrimination, and incarceration designed to deprive her of her constitutional due process rights, her fundamental right to parent her children, her first amendment right to free speech and her right to be free from government conspiracy with private actors to deprive her of her rights.

## JURISDICTION AND VENUE

1.  This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the Constitution of the United States of America, thus raising multiple federal questions.

2.  This Court has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 because this action seeks redress for the deprivation of constitutionally protected rights by those acting under color of state law.

3.  This Court has jurisdiction to grant the declaratory and injunctive relief sought, pursuant to 18 U.S.C. § 2201, 18 U.S.C. § 2202, and by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

4.  This Court has jurisdiction over Plaintiffs' claims for attorneys' fees pursuant to 42U.S.C. § 1988.

5.  Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Plaintiff and defendants reside in this district and all defendants are residents of Colorado

and because all events or omissions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

6. K.A. is a mother who, at all times relevant to this action, resided in Colorado.

7. Upon information and belief, Defendant Michelle Barnes (hereinafter, "Defendant Barnes"), was and is the Executive Director of the Colorado Department of Human Services, a state agency which is located at 1575 Sherman St., Denver, CO 80203.

8. Arapahoe County Department of Human Services, Division of Child & Adult Protection Services, ("Defendant ACDHS") is a county governmental agency whose "mission is to build strong communities by promoting the safety, independence and stability of individuals and families" (emphases added) and which is located at 14980 E. Alameda Dr., Aurora, CO 80012.

9. Upon information and belief, at all times relevant to this action, Defendant Michelle Dossey (hereinafter, "Defendant Dossey"), was and is the Division Manager of the Arapahoe County Department of Human Services, Division of Child & Adult Protection Services, which is located in Arapahoe County at 14980 E. Alameda Dr., Aurora, CO 80012.

## GENERAL FACTUAL ALLEGATIONS

**Defendants Become Involved in a Divorce and Custody Dispute**

10. In May 2016, K.A. and C.P. jointly filed for divorce with a 50/50 custody agreement.

11. Together they had three daughters, then aged 3, 6 and 9, and K.A. was a stay-at-home mother.

12. In June 2017, the youngest daughter's therapist reported an allegation of sexual abuse by C.P. to Arapahoe County Human Services (the "Department"). The Department found the allegation inconclusive.

13. In July 2017, a second report of sexual abuse was made regarding the middle daughter, age 7.  After a forensic interview, the allegations were founded by the Department.

14. The Department then filed a petition in dependency and neglect alleging that C.P. was sexually abusing the two younger girls. At the same adjudication, the Department filed a petition against K.A for emotional abuse/coaching the children.

15. Prior to the hearing, the Department, through caseworker Marika Quinn, served the petition on K.A. on September 13, 2017 at K.A.'s home.

16. Upon information and belief (see Niceta Affidavit), Marika Quinn and other Department staff were not neutral and had predetermined opinions of C.P. and K.A., and only went through the motions during this entire process with K.A.

17. Upon information and belief (see Niceta Affidavit), false entries about meetings were made in K.A. and C.P.'s case.

18. The entry of false meetings or altered information about meetings was a practice the Department engaged in regularly.

19. Quinn immediately forced K.A. from her home, telling K.A. she could either leave the home and the children could stay with K.A.'s mother or she would place the children in foster care. K.A. left the home.

20. Seven weeks later, a jury found that the children were not dependent or neglected by either parent.

21. The Court ordered a Parental Responsibilities Evaluator to determine custody.  Julie Van Heyningen was hired and paid in full by the father, C.P. Van Heyningen never interviewed the children about the allegations of sexual abuse against the father, C.P. and instead administered a projective Rorschach Inkblot test to say the mother, K.A. misinterpreted her daughters' continued outcries of sexual abuse against their father.

22. Julie Van Heyningen recommended 50/50 custody and reintegration therapy for father and children.

23. K.A. filed a complaint with the Colorado Department of Regulatory Affairs in December of 2019 against Julie Van Heyningen for violation of C.R.C.P 45.  A complaint was also filed against the reintegration therapist, Barbara Shindell, for a documented violation of confidentiality. [*See exhibit 1- Dora Complaints*]

24. In 2017, C.P. filed a defamation case against K.A. and K.A.'s private investigator. The case was settled to include an order prohibiting the parties from defamation ("2017 settlement order").

25. In March 2018, the divorce was finalized, and each parent had equal custody.

**Discrimination and Constitutional Violations Against K.A. are Elevated and Continue**

26.  In December 2018, the oldest daughter's personal therapist reported another sexual abuse allegation against C.P. to the Department.

27. The children continued supervised visitation with C.P. and no forensic interview occurred over the allegation.

28. The Department closed their investigation of sexual abuse against C.P. on February 6, 2019.

29. On February 11, 2019, the Department Manager, Cheryl Evans, and Case Worker, Morgan Baptist, went to the Children's school and conducted their own surreptitious interview.

30. On February 22, 2019, another Dependency and Neglect allegation was filed against K.A. for emotional abuse/coaching of the oldest daughter.

31. On February 22, 2019, the father, C.P., was awarded full temporary custody.

32. K.A. was allowed visitation supervised by the Department through the Parenting Time Coordinator for Arapahoe County Human Services, Rachael Ryan. The visits were two days a week, one hour each. The visitation was videotaped.

33. During the week of April 8-12, 2019, the County again prosecuted K.A. for dependency and neglect.  A jury found the children dependent and neglected.  K.A. appealed the finding and the judgment. [*See Exhibit 2 Opening Brief 19CA1161*]

34. K.A. was put on a treatment plan with supervised visitation. During the period of this treatment plan and K.A.'s supervised and recorded visits, the children continued to make outcries of sexual abuse against C.P. on videotape at the Arapahoe County Department of Human Services, which the Department and Guardian Ad Litem ("GAL"), Sarah Yarbrough refused to investigate.

35. Upon information and belief, (see Niceta Affidavit), Yarbrough would text other Department workers about K.A., calling her "stupid" and saying her brain hurt from having to listen to her. She also had a predetermined opinion about K.A. rather than conducting a real investigation. This was a practice of the Department.

36. Yarbrough, Quinn, and Chase were constantly unprofessional, texted about K.A.'s case to avoid later discovery, and discussed what should happen to K.A. because they did not

like her. Treating single mothers like this in dependency hearings was a practice of the Department.

37. K.A.'s visits were suspended by the Department and GAL for 10 weeks and the children were isolated from everyone and anything that had a connection to their mother.

38. During a supervised parenting time visit on April 17, 2019, the youngest daughter, age 6, made an outcry of sexual abuse against C.P. on videotape at the Department.  [*See EXHIBIT 3 RM PROPST CORA DISCOVERY FEB 19 TO 5-24-19_Redacted copy, pages 5-12, EXHIBIT 4- 41719]*

39. The Department through caseworker, Marika Quinn, failed to conduct forensic interviews of the children, closed the referral within an hour of the child's outcry, and sent the children home with their father. The Department and Quinn attempted to deflect their failure to investigate by falsely accusing Sungate Kids, the County's referral agency, of refusing to do forensic interviews of the children.  This was in contradiction to testimony of Diana Goldberg, the Executive Director of Sungate Kids, who stated under oath on April 11, 2019 that it was the Department that did not request an interview.

40. On April 24, 2019, the oldest daughter's 5th grade teacher made a referral of sexual abuse of father, C.P. to the Department.  [*See exhibit 3- "EXHIBIT 3 RM PROPST CORA DISCOVERY FEB 19 TO 5-24-19_Redacted copy", pages 1-4* ]

41. On June 6, 2019, the three daughters' dance teacher made a referral of sexual abuse of father, C.P.,  to the Department.  [*See exhibit 5- Assessment Summary multiple June 2019.191029 .pdf, pages 1-5*]

42. That weekend, the Department and GAL Sarah Yarbrough pulled the children from their dance recital.

43. The Department, through caseworker Marika Quinn, and GAL Sarah Yarbrough lied about communications with the dance studio, stating the dance studio would not let the children dance in their yearly recital.  This was false.  The decision to not allow them to dance was made by Quinn, Yarbrough, and C.P.

44. As part of her treatment plan, K.A. was also ordered to attend therapy. The Department would only allow K.A. to have therapy with three therapists approved by Marika Quinn and GAL Sarah Yarbrough and would not allow K.A. to continue working with another therapist with 28 years of experience.

45. K.A. was also ordered to obtain a psychological evaluation with Dr. Jessica Bartels. Dr. Bartels was the only evaluator in the state of Colorado allowed by the Department, GAL Yarbrough and Judge Natalie Chase to conduct the evaluation of K.A.

46. On June 21, 2019, the youngest daughter, age 6, made yet another outcry of sexual abuse at the supervised visitation on videotape at the Department. [*See exhibit 5- Assessment Summary multiple June 2019.191029 .pdf, pages 6-9*]

47. The Department, through caseworker Marika Quinn and the GAL Sarah Yarbrough, again refused to investigate the outcry.

**Defendants Tie Compelled Speech to Parental Rights**

48.  K.A. complied with the treatment plan ordered in June 2019 and continued the supervised visitation.

49. The children would be visibly upset at the end of the visitation at being separated from their mother.

50. The week of July 4, 2019, K.A. was told by Arapahoe County Parenting Time Coordinator Rachael Ryan and her manager, Alyssa Berge, if the children continued to be upset, they would consider this abuse and cancel the visits.

51. This caused great stress to K.A. and in August 2019, K.A. provided documentation from her medical doctor regarding a low-grade cancerous skin condition that was flaring due to stress. The Department and GAL, Sarah Yarbrough, then told K.A. that the children were telling people that the skin condition was a fatal cancer.

52. The Department and GAL threatened to cancel the visits unless K.A. would tell the children she had lied about having cancer. K.A. had not at any time told the children she was dying of cancer, nor had she even seen the children unsupervised for six months. K.A. refused to lie about a health condition of 20 years labeled by The World Health Organization as a low grade cancer. [*See exhibit 6, Letter From Medical Doctor*]

53. On August 22, 2019, a hearing was held and Judge Natalie Chase ordered the children to be removed from their school of six (6) years, despite the school being agreed upon in the divorce decree.

54. Judge Chase additionally ordered that the children never dance at their dance studio of five (5) years.

55. The Department and GAL Yarbrough canceled all visits with K.A.'s children on August 30, 2019 without a hearing. The Department then falsely testified and said K.A. failed to attend visits which they had canceled.

56. Judge Chase also ordered K.A. to comply with the Department and GAL's request to lie about her health to her children. "If she does not comply with the Guardian ad Litem and Caseworker's request, parenting time visits will be suspended. There will be a notice;

we'll have a hearing, but I'm going to let all parties be aware that this Court will consider

having those visits suspended until we get the evaluation back." [*See Exhibit 7, 08-22-19*

*Hearing 19JV178, page 33 lines 21-25 & page 34 line 1,  See Exhibit 8, Office of the*

*Child Representative Complaint of GAL, Sarah Yarbrough*]

57. On September 30, 2019, a hearing was held and K.A. asked to have her visits with her

children reinstated.  K.A. presented medical information and a letter clarifying her

diagnosis from her medical doctor stating she correctly identified her condition of 20

years.  The letter and information was ignored by the Department.  With regard to The

World Health Organization's categorizing K.A.'s condition as a low grade cancer, Judge

Natalie Chase stated "something from Europe does not suffice.  We don't live in

Europe.  We live in the United States." [*See Exhibit 9 Transcripts 9/30/2019 hearing,*

*page 33 lines 9-11*]

58. The Department at the termination hearing stated that K.A. did not show up for her visits

for 10 weeks and this was grounds for termination because she did not complete her

treatment plan.

59. In reality, the visits were canceled by the Department for 10 weeks, but they continued to

lie about K.A.'s supposed failure to show as retribution for her declining to participate in

false, compelled speech.

60. During the 10 weeks of canceled visits the Department and GAL continued to ignore the

mother's medical doctor, medical research, and other communications stating facts and

truth.

61. The reintegration therapist, Barbara Shindell, stated in an email to the GAL that she was

coaching the children to understand that their mother was a liar.

62. In December 2019, after the court-ordered mental health evaluation by Dr. Jessica Bartels was finalized, there was no finding that K.A. was a threat to her children or any children. K.A. was again allowed to start seeing the children one day a week for one hour.

63. The department and GAL, Sarah Yarbrough refused to allow K.A to return to 2 hours a week of visits or have any additional time with her children.  Judge Natalie Chase and the Department in collusion with the GAL team of Sarah Yarbrough and Allison Bettenberg and C.P. stated K.A. was mentally ill with no evidence.  Without any supporting mental health diagnosis or stated concern from any mental health professional, Judge Natalie Chase found, " This Court is significantly concerned with Respondent Mother's mental health issues that if the Court were to allow her to have access to the teachers -- because this Court is so far unaware that she has addressed her mental health issues – that she would not sabotage the new school or the new teachers or something along those lines.  That's what this Court is concerned about." [*See Exhibit 7 08-22-19 Hearing 19JV178, page 32, lines 12-18*]

**Defendants Conspire with a Private Actor to Deprive K.A. of Her Civil and Constitutional Rights, to Terminate Her Parental Rights Without Due Process, and Jail Her for Speech, Including the Speech of Others**

64.  Upon information and belief, the collusion between Judge Chase, the GAL, the Department, and C.P.'s attorney would continue until the resignation of Judge Chase in May of 2021.

65. During a dinner visit in early 2020, the Department called K.A. an hour in advance to inform her that her children had new eating habits and K.A. could not bring the home

cooked meal she had prepared. She was instead arbitrarily required to bring fast food from three different restaurants for each daughter.

66. In February of 2020, the Department informed K.A. that C.P. now wanted to vaccinate the children, in contravention to the divorce agreement. A hearing on the issue was set and then canceled.

67. In April of 2020, K.A. put a petition online advocating for protection of her children. In May 2020, the Department filed a petition to terminate K.A.'s parental rights. At the same time, the Department filed a protective order. ("May Protective Order")

68. Upon issuance of the May protective order, the Department filed a contempt citation and the court required K.A. to take down the petition, prohibited her "from posting on social media sites information related to the Minor Children and the allegations of abuse or neglect associated with this case" (including doing so through third parties).   K.A. removed the petition soon after it was served.

69. In June 2020, K.A.'s attorney was permitted to withdraw over K.A.'s objection.

70. In August 2020, K.A. was found in contempt under the 2017 settlement order for posting the petition.  She was sentenced to five months in jail to begin August 31, 2020. Despite this sentence, the Department proceeded with its contempt citation for the same conduct.

71. On August 25, 2020, K.A. appeared at the termination of parental rights hearing. The termination hearing was combined with the Department's contempt charge. K.A. was without counsel at the hearing. She was denied a continuance and she proceeded *pro se*.

72. That evening, K.A. was hospitalized.

73. The next day, an ADA advocate informed the court that K.A. was hospitalized. [*See, Exhibit 10, Affidavit from Danielle Duperret.*]

74. Rather than delaying the hearing, the Court proceeded to terminate K.A.'s parental rights without her present, finding K.A. had engaged in "parental alienation." The Court terminated K.A.'s parent-child legal relationships with her three daughters, basing its decision on "parental alienation."

75. Parental alienation is a mental health theory that has been heavily discredited by major mental health associations worldwide, but also used by social services departments to remove parents – mothers specifically – from the lives of their children. *See* Joan S. Meier & Sean Dickson, Mapping Gender: Shedding Empirical Light on Family Courts' Treatment of Cases Involving Abuse and Alienation, 35 Law & Ineq. 311 (2017).

76. The Court also found K.A. in contempt under the Department's May protective order and delayed sentencing. This was the second contempt for the posting of the petition.

77. On August 26, 2020, the Court sealed the court records, stating that no party was to release any filing in the case to any third party or ask other people to post anything on the internet regarding the case.

78. K.A. reported to jail on August 31, 2020 on the sentence from the first contempt.

79. During the period from August 31, 2020 to July 2, 2021, K.A. was incarcerated. During this time COVID protocols did not allow for in person visitation and the law library remained closed throughout.

80. C.P. filed another civil motion for a protection order through counsel stating K.A. was a physical threat because she did not attend the 2nd day of the termination and contempt sentencing and the act of violence was having her parental rights terminated due to emotional abuse.  A hearing was scheduled for September 23, 2020.

81. On September 16, 2020, new counsel entered for K.A. to represent her at the September protection hearing.

82. On September 23, 2020, the Court entered a permanent civil protection order ("September protection order") under section 13-14-106, C.R.S. 2021, ordering that K.A. is "not to talk to 3rd party about case except for [attorneys] or to use 3rd party to post on internet." …including not speaking to any medical professional or her priest.

83. The Court ordered that attorneys not share the court record with K.A. herself.

84. K.A. requested a reconsideration of the order. For the purpose of the instant hearing and future hearings, the Court (Judge Natalie Chase) also found K.A. "incredible as a matter of law." The Court also signaled to C.P. that another contempt citation was expected by the Court.

85. On October 1, 2020, C.P. filed a third contempt citation under the September protection order against K.A. for an on-line posting by California Protective Parents Association. California Protective Parents Association signed an affidavit stating K.A. had no knowledge of the posting and did not direct the posting. A hearing was set for November 6, 2020.

86. On October 6, 2020, new counsel for K.A. requested access to the now sealed court file to appeal the September protective order. The Department and Guardian ad Litem objected to the motion.

87. On October 7, 2020, the Court granted the motion to access the file in part and ordered: "Parties are strictly prohibited from sharing the transcripts with any third person. Parties are strictly prohibited from giving copies of the transcripts to their clients. Clients are only allowed to view the transcripts. Clients and attorneys are prohibited from copying

the transcripts, taking photos of the transcripts or using the transcripts for any purpose other than litigation. Parties and clients are prohibited from posting any transcript on any social media venue or organization. Parties and clients are prohibited from sharing this order to any third party. Failure to comply with this rule shall result in contempt of court."

88. On October 8, 2020, K.A. asked for reconsideration of the September protection order under C.R.C.P. Rule 59.

89. On November 7, 2020, a default judgment was entered on a second defamation case filed by C.P. in June 2020. Despite K.A. having counsel, her counsel was never informed of the filing or the hearing dates. K.A. was incarcerated at the time of the hearing in the county jail and was not informed of the setting. Judgment was entered for C.P. in the amount of 1.76 million dollars.

90. On November 6, 2020, K.A. was sentenced on the second contempt to six months consecutive to the first sentence.

91. Also on November 6, 2020, a third contempt hearing was held. The Court found K.A. was responsible for third-party posting of case related information. K.A. was sentenced on this third contempt for another six months consecutive.

92. On December 5, 2020, the Court reconsidered the September protective order and entered a new verbal protective order. The amended order as reflected in the transcript says:

> Because this Court is certain that more harm will occur from future postings regarding the allegations of sexual abuse in this case, the Court first ORDERS that [K.A.] shall be restrained from posting any information related to the allegations of abuse or neglect which were investigated during this case on any website or social media outlet. This includes posting through a third party, which is subject to the provisions outlined above, as [K.A.] may be held liable for directing any third party to post such information. Further, the Court further ORDERS that [K.A.] shall be

restrained from discussing the allegations of abuse or neglect which were investigated during this case or providing any case-related information, including but not limited to any documents within the case file, to any third party who does not have a legal duty of confidentiality to [K.A.] Thus, [K.A.] may discuss this case with her attorneys, therapists, or doctors, but she may not direct these third parties to release or disseminate case-related information to any other third party or to the public.

93.  The verbal order was never served on K.A. and K.A. was prohibited from accessing the record in the case. Attorneys were prohibited from sharing transcripts in the case with K.A.

94. On December 28, 2020, an editorial was published in the Colorado Springs Gazette entitled "A sick mom, alone in a cell, on Christmas Eve" by University of Colorado Regent Heidi Ganahl.

95. Two days later, the fourth motion for issuance of a contempt citation was filed by C.P. under the amended September order, again for third-party communications.

96. On January 6, 2021, K.A.'s attorneys withdrew from the case. K.A. hired new counsel on March 4, 2021.

97. On March 12, 2021, K.A. was found in contempt on the fourth citation by Judge Natalie Chase and sentenced to six months consecutive.  The total contempt sentences combined was now 23 months.

98. On March 24, 2021, K.A. filed a motion to set aside the default judgment in the second defamation case. The motion was denied by Judge Peter Michaelson on May 4, 2021.

99. Testimony at the fourth contempt hearing in March of 2021 included recorded phone calls where a friend of K.A. spoke to her about retaining counsel or alternative sentencing. The Court found this conversation was a violation of the order and that "talking about motions to withdraw" was a "direct violation of this Court order" and that

"talking about attorneys in this case" and "about the unfairness of this case...is a direct violation of this Court's order."

100.     The Court concluded with a sentence of six (6) months consecutive in jail as punishment under C.R.C.P. 107 as punitive contempt of court.

101.     K.A., through counsel, sought appeal of the contempt to the Colorado Court of Appeals in April of 2021.

102.     On May 10, 2021, K.A., through separate counsel, filed a writ of habeas corpus in Arapahoe County Court alleging K.A. was being held in violation of her First, Eighth and Fourteenth Amendment rights.

103.     In late May of 2021, the Department, C.P. and the Guardian Ad Litem jointly filed contempt citations against K.A.'s counsels for releasing information in the case in the court filings. [*See Exhibit 11. Citations against Counsel]*

104.     Also in May of 2021, the Colorado State Office of Respondent Parents' counsel appointed K.A. counsel to appeal the termination of her parental rights.

105.     Colo. R. App. 3.4 only allows 21 days, with no exceptions, for an appeal of the termination of parental rights – made on any basis, with or without the parent present.

106.     On June 4, 2021, the Colorado Court of Appeals accepted the termination case out of time, even though it was filed after the 21 day limit. The same day the court accepted the case, C.P., in concert with the GAL and the Department, filed an objection.

107.     Throughout the proceedings, the Department, in collusion with C.P. and the GAL, conspired to use the system to deprive K.A. of her constitutional rights.

108.     The Department filed and signed multiple pleadings together with C.P.'s private attorney and the GAL, including motions, objections and contempt citations.

109. On June 18, 2021, the Colorado Court of Appeals vacated its prior order and dismissed the appeal. A petition for certiorari to the Colorado Supreme Court was denied on September 7, 2021.

110. CO Rev Statute § 19-3-612 (2016) (§ 19-3-612(2)(II)(c) states a "former" parent "can only file for reinstatement of parental rights if the child does not have a legal parent, is not in an adoptive placement, and is not likely to be adopted within a reasonable period of time, and other permanency options have been exhausted."

111. Plaintiff is barred from filing for reinstatement of her parental rights because her former husband has full custody and the children have a legal /parent.

112. On June 2, 2022, The Court of Appeals upheld the contempt order, finding that although there were "substantial constitutional issues regarding the protection orders", because Petitioner did not timely appeal the underlying order, the collateral bar rule precludes her from challenging the constitutionality of the orders in her appeal. [*See Exhibit 12 Opinion, p. 15.*]

113. The Colorado Supreme Court denied a petition for Certiorari on the contempt order on January 7, 2023.

114. On March 1, 2023, a senior judge assigned to the case reconsidered the fourth contempt sentence and sentenced K.A. to 30 days in-home detention. At the March 1, 2023 hearing, C.P., the County and the GAL appeared together in objection to the request.

115. On April 13, 2023, the court closed the case and transferred the protective order to another case.  At the April 13, 2023 hearing, C.P., the AC and the GAL appeared together requesting the protective order transfer to another court.

116. On October 24, 2024, Robin Niceta, a former caseworker with the County familiar with K.A.'s case and the County practice and procedures contacted Counsel for K.A. by email with additional information about K.A.'s case.

117. On November 27, 2023, Niceta provided a declaration to counsel.

118. Niceta provided information unknown and unattainable to K.A. including:

- The recommendations and outcomes of K.A.'s case were predetermined by the County

- The County, the GAL and the parental evaluator conspired to deprive K.A. of her parental rights

- The County would, as a policy and practice, alter notes and falsify notes in the case files

- The County would, as a policy and practice, use private cell phones to avoid detection of records

- The County falsified a record regarding a purported meeting on June 30, 2019 regarding K.A.'s case (Niceta declaration)

119. The County relied upon the theory of parental alienation to unconstitutionally deprive Plaintiff of her right to parent.

## CLAIMS FOR RELIEF

### Count One

**(Fourteenth Amendment – Procedural Due Process Violation)**

**(42 U.S.C. § 1983)**

**(All Defendants)**

120. Plaintiff realleges the facts *supra*.

121. The Department, GAL and the 18ᵗʰ Judicial District of Arapahoe County violated K.A.'s procedural due process rights when:

122. Defendants refused to investigate K.A.'s children's continued outcries of sexual abuse against their father, C.P.

123. Defendants had ex parte meetings before hearings including Judge Natalie Chase, Sarah Yarbrough, Marika Quinn and Kristi Erickson to decide the details and rulings of the future hearings.

124. It was a Department practice to predetermine the outcome of certain cases, particularly, where – as in this case – a social worker or Department staff person thought the father was "dreamy" and the mother was "stupid" or "crazy."

125. Defendants asked a mental health evaluator to lie and make false mental health claims about K.A.

126. Defendants ignored K.A.'s Medical Doctor's letter and statements to the court and canceled visits in order to brainwash the children.

127. Defendants demanded K.A. lie to see her children.

128. Defendants falsely wrote in documents submitted to the Court that K.A.'s mother, maternal grandmother, had hid her daughter in the trunk of her car to see her children.

129. Defendants intentionally and misleadingly relied on prior investigations involving K.A., when K.A. was found not guilty by jury trial.

130. Defendants failed to conduct a forensic interview of K.A.'s children at *any* point in the investigation of case 19JV178.

131. Defendants gave false testimony to have an ADA advocate removed from the case.

132. Defendants refused to admit a PTSD diagnosis by 3 medical professionals as a disability for ADA accommodations.

133. Defendants refused K.A.'s request for psychological evaluations of the children for the termination hearing.

134. Defendants offered false testimony at the termination hearing stating K.A. did not complete her treatment plan and missed visits when it was the Department that had canceled visits.

135. Attorneys were ordered not to share the court records of her own case with K.A.

136. The Department objected in court to K.A.'s new attorneys being given access to her sealed record.

137. Defendants did not allow K.A. to speak during the hearing of termination of her parental rights to offer her own evidence and facts.

138. Twenty-one days is an inadequate time period to appeal a permanent termination when K.A. was incarcerated. The permanence of the time limit in the law is overbroad and the 21-day limit was wielded against K.A. to deny her due process.

139. K.A. remained in jail for more than 10 months, from August 31, 2020 to July 3, 2021 during the COVID-19 global pandemic, without the resources, means and opportunity to represent herself.

140. Her access to a law library, counsel, her own file and other means to represent herself were limited.

141. Despite the fact that other courts and judicial systems around the nation extended appeals timelines, particularly because courts were not working or functioning on the same

timelines during COVID-19, Plaintiff was given no extension of the 21-day time period

granted by Colorado law to appeal a permanent termination of parental rights.

142. CO Rev Statute § 19-3-612 (2016) (§ 19-3-612(2)(II)(c) requires that in a divorce case

like K.A.'s where one parent was awarded full custody but her rights were fully

terminated, this reinstatement will only be possible if her former husband dies – and even

then, her ability to file is not certain as another family member could first apply to adopt

her children.

143. Colo. R. App. 3.4 only allows 21 days, with no exceptions, for an appeal of the

termination of parental rights – made on any basis, with or without the parent present.

144. The acts of Defendants were intentional and deprived Plaintiff of her rights, privileges,

liberties, and immunities secured by the Constitution of the United States.

145. The laws of Colorado enforced by Defendant Barnes deprived Plaintiff of her rights,

privileges, liberties, and immunities secured by the Constitution of the United States.

## Count Two

**(Fourteenth Amendment – Substantive Due Process Violation: Loss of Parental**

**Rights)**

**(42 U.S.C. § 1983)**

**(All Defendants)**

146.  Plaintiff realleges the facts *supra*.

147. Plaintiff realleges the allegations in the Procedural Due Process cause of action *supra*.

148. All of these actions led to her being permanently deprived of her parental rights – a

constitutional liberty right under the Fourteenth Amendment.

149. The acts of Defendants were intentional and deprived Plaintiff of her rights, privileges, liberties, and immunities secured by the Constitution of the United States.

150. The laws of Colorado enforced by Defendant Barnes deprived Plaintiff of her rights, privileges, liberties, and immunities secured by the Constitution of the United States.

## Count Three

**(Fourteenth Amendment – Equal Protection Violation – Discrimination Based on Marital Status and Race)**

**(42 U.S.C. § 1983)**

**(All Defendants)**

Marital Status Discrimination

151.  Government actors Marika Quinn, Rachel Ryan, Kristi Erickson, and the Department treated Plaintiff differently and discriminatorily based on her marital status.

152. On May 12ᵗʰ 2020, The Department and county attorney Kristi Erickson submitted a form indicating on which basis they were recommending that Plaintiff's parental rights be terminated. One of the boxes checked on the form was "severe emotional abuse."

153. In the explanation of this selection, Kristi Erickson wrote that K.A. had alienated her children from their father by asking the children to make up stories about their father abusing them.

154. Kristi Erickson wrote that this caused mental harm and psychological damage to the children.

155. County Attorney Erickson relied upon the widely discredited "parental alienation" theory used to remove parental rights, particularly from mothers. *See* Joan S. Meier & Sean Dickson, Mapping Gender: Shedding Empirical Light on Family Courts' Treatment of Cases Involving Abuse and Alienation, 35 Law & Ineq. 311 (2017).

156. Plaintiff denies that the social services workers were correct in their allegations, and she continues to assert that her children were suffering abuse.

157. Even if a Court determined that the Department's workers allegations were true, their accusation and use of the accusation to permanently strip Plaintiff of her parental rights is discriminatory.

158. It is well documented in psychological, counseling, and marriage studies that parents who do not get along commonly lie about each other, make false accusations, and involve the children in stories that are told about the other parent.

159. No one asserts this is healthy behavior or that it creates the ideal family life for children.

160. However, in no circumstances do government actors have the right to come into a married couple's home and act to terminate either person's parental rights because they lie about their spouse or attempt to get one of their children to lie about their spouse.

161. Plenty of married parents inflict emotional abuse on their children by name-calling, berating them, and belittling them.

162. Again, while no one asserts this is healthy behavior, the government cannot and does not use it as a way to strip parents of their parental rights.

163. As a contrast, the government may – and rightly does – strip married parents of their parental rights when physical or sexual abuse is involved or when drugs, alcohol, or crime

seriously impairs their ability to care for their children and endangers the children's physical safety.

164. "Emotional abuse" is a category used by Defendants, relying on "parental alienation," to terminate one parent's rights when that parent is accused of alienating the children from the other parent. It is a unique accusation discriminatorily used based on a parent's marital status.

165. Because of this, divorced parents and children of divorced parents are treated differently than married parents and children whose parents are married.

166. Federal courts have used an intermediate scrutiny standard to evaluate discrimination based on familial status, such as the legitimacy of a child. *See Levy v. Louisiana*, 391 U.S. 68 (1968).

167. In Plaintiff's case, Defendants were able to strip her of her parental rights by using a category only used against parents of her marital status, because it was not used in conjunction with any accusations of physical abuse, actual neglect, crime, or drug or alcohol abuse.

168. Defendants used this discriminatory basis to ask the courts to take the harshest possible action against Plaintiff – the permanent termination of her parental rights – when there were other options such as shared custody and supervised visitation.

169. This discrimination cannot meet the intermediate scrutiny standard.

Race-Based Discrimination

170.  Plaintiff realleges the facts *supra*.

171. Defendants refused to give Plaintiff a chance at remediation or rehabilitative programs before permanently terminating her rights.

172. The "treatment program" they assigned to Plaintiff forced her to engage in compelled speech and/or removed her free speech rights, including ordering her to refrain from using the legal system until she spoke with the Department and her GAL, even though they had a history of lying about her.

173. The "treatment program" demanded nebulous and immeasurable outcomes such as being "respectful," "positive," and "appropriate."

174. Any words or notes between Plaintiff and her children that the Department could not see or hear were banned.

175. The "treatment program" also demanded Plaintiff lie about her own medical history, and when Plaintiff refused to do so, the Department lied about her participation in the program and canceled her visits with her children, and then claimed she did not show up.

176. The "treatment program" amounted to compelled speech and a restraint on freedom of speech and was used as a vehicle to lie about Plaintiff and terminate her parental rights permanently.

177. Defendants did not have a priority of not breaking up the family, based on her race, as Indian mothers would have been treated differently, based on federal law.

178. The Indian Child Welfare Act (ICWA) requires "Any party seeking to effect a…termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S. Code § 1912.

179. The ICWA requires a standard of prioritizing Indian families and keeping them together, based on their race.

180. Scores of federal cases demonstrate that federal courts will reverse state court decisions that terminate the parental rights of Indian parents, solely based on race criteria.

181. Plaintiff agrees that "active efforts" "to provide remedial services and rehabilitative programs designed to prevent the breakup of the…family" is a good priority for the federal government as healthy families are the foundation of a healthy society.

182. However, Plaintiff is a non-Indian woman and was not afforded this same, race-based treatment.

183. Instead, Plaintiff's parental rights were permanently stripped from her while she sat in a hospital, unable to defend herself in court, and afterwards placed in jail due to an unconstitutional gag order which harmed her ability to appeal within the required 21 days.

184. Rather than offering any attempt at real remedial services or rehabilitative programs that could have kept her familial rights intact, Defendants kept her in jail through her appeals timeline during COVID, and the state appeals court refused to grant her an exception to the 21-day time limit to appeal, even when other states and other courts granted additional time because of the systemic limits of COVID on the judicial and criminal systems.

185. Simply put, if Plaintiff was an Indian mother, her parental rights would have been protected by Defendants and, if not, they could be protected by the federal courts.

186. This is a race-based classification.

187. The race-based priority that affords Indian parents with the ability to keep their parental rights should be afforded all parents, barring any proof of physical, sexual, or substance abuse or criminal activity that harms the children – which is nonexistent in Plaintiff's case.

188. The federal priority to "prevent the breakup to the Indian family" should be extended to all races and was discriminatorily not applied here.

189. While the U.S. Supreme Court later vacated the ruling for lack of standing, in *Brackeen v. Haaland*, No. 18-11479 (5th Cir. 2021), the Fifth Circuit affirmed the District Court's ruling that the ICWA's preferences for Indian families over non-Indian families unconstitutionally discriminates on the basis of race.

190. Equal protection requires that government actors not "erect[] a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993); see also *Turner* v. *Fouche*, 396 U. S. 346, 362 (1970).

191. The acts of Defendants were intentional and deprived Plaintiff of her rights, privileges, liberties, and immunities secured by the Constitution of the United States.

192. The law of Colorado, enforced by Plaintiff Barnes, deprives Plaintiff of her rights, privileges, liberties, and immunities that are secured by the Constitution of the United States, based on her marital and familial status and race.

## Count Four

**(First Amendment Violation – Unconstitutional Gag Order and Compelled Speech)**

**(42 U.S.C. § 1983)**

**(All Defendants, except Defendant Barnes)**

193.  Plaintiff realleges the facts *supra*.

194. The verbal order from the court banning K.A. from posting content on social media or from allowing third parties to do so was never served on K.A.

195. K.A. was prohibited from accessing the record in the case, and Defendants requested that she be blocked from access.

196. Attorneys were prohibited from sharing transcripts in the case with K.A.

197. The Department and other Defendants continually asked that Plaintiff be held in contempt when she spoke to anyone about her case.

198. She was, in fact, incarcerated when she spoke to a friend on the phone about her legal situation and need for counsel.

199. Defendant was ordered that she could not discuss the case even with mental or medical health professionals.

200. The gag order placed on Plaintiff, at Defendants' request, resulted in months of incarceration, including during the time her parental rights were permanently terminated.

201. Additionally, as alleged *supra*, Defendants ordered K.A. to lie about her medical health to her children if she wanted to continue to have visitation with them, constituting compelled speech that Defendants tied to the exercise of a constitutional right: parental rights.

202. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in…matters of opinion…" *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943).

203. The acts of Defendants were intentional and deprived Plaintiff of her rights, privileges, liberties, and immunities secured by the Constitution of the United States.

## Count Five

### (First Amendment Violation – Viewpoint Discrimination)

### (42 U.S.C. § 1983)

### (All Defendants, except Defendant Barnes)

204. Plaintiff realleges the facts *supra*.

205. State actors targeted K.A. for her viewpoints on vaccination and healthy food, accusing her of neglect based on her minority viewpoint.

206. On May 12, 2020, (social services workers) submitted a form indicating on which basis they were recommending that K.A.'s parental rights be terminated. One of the boxes checked on the form was "neglect." In their explanation of this selection, the Department and GAL wrote that K.A. did not wish to vaccinate her children. The Department also detailed the type of diet that K.A. fed her children.

207. Choosing to not vaccinate her children and feeding them an organic, vegan, gluten free diet was not a new decision or activity by K.A. Instead, this is the way she has always raised her children, including during her marriage to C.P..

208. For a social services worker, acting under color of state law, to determine that choosing not to vaccinate a child (a well-known decision made by a substantial, but minority, number of parents throughout the United States) is "neglect" is clear viewpoint discrimination. The same is true for a choice to feed a child a gluten-free, dairy-free, and vegan diet.

209. K.A. always fed her children and took them to medical care appointments when needed.

210. There is no accusation that her children were hungry, unfed, or unwell.

211. Instead, Department actors Marika Quinn and Kristi Erickson decided that, based on a viewpoint difference – but no actual harm to her children –, K.A. has neglected her children.

212. K.A. has committed hours of time over a period of years to study vaccinations and healthy food for children.

213. Naturally, there are many different viewpoints on vaccinations and which foods and diets are best for children.

214. It is discriminatory for the State or state actors to determine that a parent who has a contrary or minority viewpoint on vaccinations or health food is guilty of "neglecting" a child.

215. In the definition of neglect of a child, Colorado state law includes a situation where "the child's parent[]…fails to take the same actions to provide adequate food, clothing, shelter, medical care, or supervision that a prudent parent would take." CO Rev Stat § 19-1-103 (1)(a)(III) (2016).

216. Colorado law also allows exemptions for vaccines for school-aged children, and, at the time K.A. chose not to vaccinate her children, Colorado law allowed personal beliefs to qualify for exemptions, thus indicating the state does not see a choice not to vaccinate as a decision that constitutes neglect.

217. No Colorado law governs which kind of food or which type of diet a parent is allowed to feed a child.

218. Defendants, through Kristi Erickson and Marika Quinn, refused to extend the protection of the constitutional rights to free speech and association in regards to Plaintiff's health choices for her children and her right to liberty to exercise her parental rights to raise her children as she saw fit without government evaluation of the particular meals she fed when there was no accusation that her children were unfed, unwell, or going hungry.

219. The specific and intentional application of Colorado's parental termination law to accuse K.A. of neglect based on her vaccination and food choices constitutes viewpoint discrimination.

220. The U.S. Supreme Court has equally condemned both blatant and thinly-disguised attempts at viewpoint discrimination by state actors. *See Cornelius v. NAACP Legal Defense & Education Fund, Inc.*, 473 U.S. 788 (1985).

221. Viewpoint discrimination based on vaccine and dietary choices, if government actors are allowed to engage in it, endangers hundreds of thousands of parents across the United States.

222. The acts of Defendants were intentional and deprived Plaintiff of her rights, privileges, liberties, and immunities secured by the Constitution of the United States.

## Count Six

### (Ongoing Conspiracy to Interfere with Civil Rights and Deprive Plaintiff of Constitutional Rights Between Public and Private Actors)

### (42 U.S.C. § 1985)

### (All Defendants, except Defendant Barnes)

223. Plaintiff realleges the facts *supra*.

224. Defendants and C.P.'s attorney continuously filing and signing court documents and pleadings together was the fruit of a conspiracy to deprive Plaintiff of her parental rights.

225. This conspiracy was based on a debunked theory of parental alienation as well as discrimination against her for her viewpoints and based on her marital status and race without due process of law.

### REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court:

1. Toll any statute of limitations because of the falsified records and continuation of the conspiracy by County Defendants against Plaintiff;

2. Restore Plaintiff's parental rights;

3. Order that Plaintiff's records, which she has been deprived of throughout this case, be given to her in full and that any falsified record be identified and corrected;

4. Issue an injunction against County Defendants to prevent future and ongoing conspiracies with private parties against Plaintiff;

5. Issue a declaratory judgment that 21 days to appeal the permanent removal of a fundamental right is inadequate and a violation of Due Process;

6. Strike the unconstitutional portion of CO Rev Statute § 19-3-612 and the 21-day, no exception limit to appeal a permanent termination in Colo. R. App. 3.4.

7. Issue a declaratory judgment that Defendants may not engage in viewpoint discrimination against parents who do not vaccinate their children or who follow particular dietary plans;

8. Issue a declaratory judgment that it is unconstitutional to permanently strip divorced parents of parental rights based on alienation of affection from the other parent since this is a category of "abuse" not wielded against married parents and that creates unequal treatment of parents and children based on familial or marital status;

9. Issue a declaratory judgment that the federal standards in the Indian Child Welfare Act affirming that states must take action to prevent the breakup of Indian families before terminating parental rights should not be race-based and should apply to families of all races, where physical, sexual, and substance abuse is not at issue;

10. Order a neutral evaluator to oversee the Department's child dependency and removal proceedings for a full calendar year to ensure the Department ends the unconstitutional and discriminatory practices in K.A.'s case;

11. Grant Plaintiff damages for being unconstitutionally jailed;

12. Grant Plaintiff her costs, expenses, and reasonable attorneys' fees; and

13. Grant any other relief or declarations this Court deems just and proper.


Respectfully submitted on this 2nd day of February, 2024.

/s/ Suzanne Taheri
**Suzanne Taheri**
West Law Group
6501 E. Belleview, Suite 375
Denver, CO 80111
Phone Number: (303)263-0844
E-mail: st@westglp.com

/s/ Kristine L. Brown
**Kristine L. Brown**
8700 E. Jefferson Ave. #370953
Denver, CO 80237
Phone Number: (720) 285-9552
E-mail: kristiburtonbrown@gmail.com

*Attorneys for Plaintiff K.A.*