IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01558-KLM

K.A.,

Plaintiff

v.

MICHELLE BARNES, et al.,

Defendants.

**PLAINTIFF'S MEMORANDUM ON THE PARENTAL ALIENATION THEORY**

Parental alienation is the theory – the policy and practice – used by Defendants under state law to terminate K.A.'s fundamental rights of speech and parental rights. Parental alienation has a complex history, but this memo will show how it 1) is a debunked legal theory; 2) allows for discrimination; 3) provides the basis for an unconstitutional taking of fundamental rights; and 4) even if present, should not result in the permanent termination of parental rights.

**Parental Alienation is a Debunked Legal Theory**

Many states, including Colorado, have laws allowing parental alienation to be used as a basis for terminating parental rights during or after a divorce. Parental alienation is a claim that one parent can easily make against the other, and it has particularly been used by a parent

accused of sexual or physical abuse who wants to assert that the other parent has taught or manipulated the children to make the accusation. Government officials – social workers specifically – use parental alienation to find that mothers accusing fathers of sexual or physical abuse have "psychological issues" and are "turn[ing] the children against their father" while the "evidence of his violence [i]s discounted."[1] Researchers "believe that the theory is being commonly used as a legal and political maneuver, not a genuine therapeutic tool."[2] In fact, "[t]o treat abuse allegations as the hallmark of alienation, as is normally done in courts today, is simply to fall into the trap…of misusing a claim of alienation to defeat, neutralize, or undermine the seriousness or validity of allegations of abuse. The two concerns should stand or fall - if at all – on their own. … In short, alienation should not be linked to abuse allegations at all."[3]

Because of the link, parental alienation hinders real reports of abuse as a less-financially-well-off parent who makes an abuse claim can easily find him or herself subject to the wealthy parent hiring a skilled attorney or coordinating with a county department of social services to strip the accusing parent of all parental rights by accusing them of "unfitness" due to "alienation." In this way, parental alienation is a stone in the sling of actually abusive parents, who can make the abuse claims appear invented and hold an alienation charge over the head of a parent who is trying to defend a child from further physical and sexual abuse. Parental alienation discourages the reporting of real abuse because the risk to a reporting parent is that they will be accused of emotional abuse and be removed from their child's life.

---

[1] Hannah Summers and Beatrix Campbell, "Parental alienation and the unregulated experts shattering children's lives," The Guardian, June 12, 2022, available at: https://amp.theguardian.com/global-development/2022/jun/12/parental-alienation-and-the-unregulated-experts-shattering-childrens-lives.
[2] David Surface, *Revisiting Parental Alienation Syndrome – Scientific Questions, Real World Consequences*, 9 Social Work Today No. 5 (Sept/Oct. 2009).
[3] Joan S. Meier, A Historical Perspective on Parental Alienation Syndrome and Parental Alienation, 6 GWU J. Child Custody 232 (2009).

A claim of parental alienation often leads to an agency determination that – based on alienation alone – the parent is "unfit" to care for his or her children. Parental alienation is used as a charge of emotional abuse or neglect by manipulation, but key researchers agree that "[t]he scientific status of PAS [parental alienation syndrome] is, to be blunt, nil."[4] Dr. Paul Fink, past President of the American Psychiatric Association, describes PAS as "junk science."[5] Jeffrey Edleson, PhD, Director of the Minnesota Center Against Violence and Abuse, and professor and Director of Research at the University of Minnesota School of Social Work says, "PAS is essentially composed of unsubstantiated claims; there's no science behind it."[6]

Parental alienation additionally ignores the complex psychological issues children of divorced parents deal with and runs to an "easy" solution of blaming one parent for a child's refusal to have a relationship with the other parent. In fact, the "five factor model for diagnosing parental alienation syndrome" includes a number of factors that could easily be explained as a child acting out during or after a divorce, untethered to the comments or actions of the so-called "favored" parent. "In fact, what the empirical evidence Johnston et al. (2005) have amassed indicates both that (i) actual 'alienation' of a child is quite rare despite many parents' derogatory conduct or statements about the other parent and (1) when children are estranged from a parent

---

[4] *See* Emery, R.E., Otto R.K., & O'Donohue, W.T. (2005). A Critical Assessment of Child Custody Evaluations: Limited Science and a Flawed System Psychological Science in the Public Interest, 6(1), 1-29; Gould, J.W. (2006). Conducting Scientifically Crafted Child Custody Evaluations (2nd ed.) Sarasota, FL: Professional Resource Pres; .Johnston,J.R., & Kelly, J.B. (2004b). Commentary on Walker, Brantley, and Rigsbee's (2004) *A Critical Analysis of Parental Alienation Syndrome and Its Admissibility in the Family Court.' Journal of Child Custody, 1(4), 77-89; Myers, J., Berliner, L., Briere, J., Hendrix, C.T., Jenny, C., & Reid, T.A. (Eds.). (2002). The APSAC Handbook on Child Maltreatment (2' ed.) Thousand Oaks, CA: Sage Publications; Smith, R., & Coukos, P. (1997). Fairness and Accuracy in Evaluations of Domestic Violence and Child Abuse in Custody Determinations. The Judges' Journal, 36(4), 38-42, 54-56; Wood, C. (1994). The Parental Alienation Syndrome: A Dangerous Aura of Reliability. Loyola of Los Angeles Law Review, 27. 1367-1415.

[5] Joan S. Meier, A Historical Perspective on Parental Alienation Syndrome and Parental Alienation, 6 GWU J. Child Custody 232 (2009).

[6] David Surface, *Revisiting Parental Alienation Syndrome – Scientific Questions, Real World Consequences*, 9 Social Work Today No. 5 (Sept/Oct. 2009).

there are always multiple reasons some of which are that parent's own conduct. Their widely published research has found that, despite the alienating behaviors of both parents in most of the families participating in their study, only 20% of children were actually 'alienated' and only 6% were 'severely alienated.' Even among the children who rejected a parent, all had multiple reasons for their hostility, including negative behaviors by the hated parent, such as child abuse or inadequate parenting, or the children's own developmental or personality difficulties (Johnston, 2005; Johnston et al., 2005)."[7]

The National Council of Juvenile and Family Court Judges (NCJFCJ), published guidelines for Courts, explaining why parental alienation should be rejected as invalid: "The discredited 'diagnosis; of 'PAS' (or allegation of 'parental alienation'), quite apart from its scientific invalidity, inappropriately asks the court to assume that the children's behaviors and attitudes toward the parent who claims to be 'alienated' have no grounding in reality. It also diverts attention away from the behaviors of the abusive parent, who may have directly influenced the children's responses by acting in violent, disrespectful, intimidating, humiliating and/or discrediting ways toward the children themselves, or the children's other parent (Dalton, Drozd, & Wong, 2006, p. 24).[8] The American Prosecutors' Research Institute and National District Attorneys' Association have also rejected PAS (Ragland & Field, 2003).[9]

Furthermore, when parental alienation is used to terminate the rights of the parent the child currently "favors," irreversible psychological damage is done to the child – all in the name of punishing the parent the child favors. To provide retribution to an adult, children suffer by being suddenly and immediately removed from all contact with the parent they are the closest to.

---

[7] Joan S. Meier, A Historical Perspective on Parental Alienation Syndrome and Parental Alienation, 6 GWU J. Child Custody 232 (2009).
[8] *Id.*
[9] *Id.*

Parental alienation has been used "in some cases, to remove the children from the homes of the parents with who they had aligned and place them in the home of the alienated parents."[10] These "alienated" parents are often actually abusive, but reports show that the "children were transferred to live with their father and all contact was cut [with their mother] with immediate effect."[11] This happens even when children are young and express fear at being given to the father. As Annelies Hagemeister, PhD, MSW, LISW, Associate Professor in the social work department at Minnesota State University-Mankato says, "A lot of this 'parental alienation' stuff is so much more focused on how the parent is being hurt or wronged; I feel like we lose sight of what's happening to the children."[12]

This has resulted in devastating results, including suicide by children[13] who are pulled away from the favored parent and given over 100% to a parent who they do not have a good relationship with. Children ought not to suffer in the name of punishing an adult, but this is precisely what occurs. In addition to suicide by the child, children given to the "alienated" parent who was actually abusing[14] them are also sometimes murdered. "Research shows approximately 58,000 children in the U.S. annually are court-ordered into the care of an abusing parent by our family courts. Since 2008, over 750 children in the U.S. have been murdered by a parent

---

[10] "Parental Alienation Syndrome (PAS) – Valid Theory or Debunked Sham?", Cullen Family Law Group, available at: https://www.lawcullen.com/family-law-newsletter-archives/parental-alienation-syndrome-pas-valid-theory-or-debunked-sham/

[11] Hannah Summers and Beatrix Campbell, "Parental alienation and the unregulated experts shattering children's lives," The Guardian, June 12, 2022, available at: https://amp.theguardian.com/global-development/2022/jun/12/parental-alienation-and-the-unregulated-experts-shattering-childrens-lives.

[12] David Surface, *Revisiting Parental Alienation Syndrome – Scientific Questions, Real World Consequences*, 9 Social Work Today No. 5 (Sept/Oct. 2009).

[13] The Cullen Family Law Group reports a mother who "blames Gardner for the death of her 16-year-old son who committed suicide after he was forced to spend time with his father from whom he was extremely alienated."

[14] *See* Alyssa G. Rao, "Rejecting 'Unjustified Rejection': Why Family Courts Should Exclude Parental Alienation Experts," 62 Boston College Law Review 5, 1759 (2021) for a discussion on how real physical and sexual abuse is often overlooked when parental alienation is used.

embroiled in a custody battle. The concept of parental alienation has and continues to play a significant role in the denial of child abuse reports."[15]

Parental alienation is commonly used to remove parental rights, even though PAS itself has been almost entirely debunked. However, "[t]o the extent that PA is widely used almost identically to PAS in court, it may not matter in practice what the theoretical differences are."[16] Richard Gardner, who claimed to be a clinical psychologist (although his actual credentials remain a mystery) invented the parental alienation theory and became a nationally-recognized "expert" until he committed suicide by stabbing himself in 2003. "Critics…point out that Gardner self-published his work [which countless cases relied on]. They allege that he failed to submit his work to the scrutiny of mainstream professional publications because he knew that it could not stand up under the peer review required by those publications."[17] As British attorney Jenny Beck QC explains: "There are arguments about whether it is even a concept, **or if it is used as a counter-allegation to domestic abuse**. There are rows about how to hear the child's voice and about experts and their qualifications – and there is deep concern about unregulated experts who have an economic interest in both diagnosis and therapeutic intervention."[18] Today, "the drastic measure Gardner often recommended, which consisted of changing custody from the

---

[15] "The 'Parental Alienation' Defense Endangers Children," Child USA: The National Think Tank for Child Protection, (Apr. 8, 2021); *See also* Leadership Council on Child Abuse and Interpersonal Violence, *How Many Children Are Court -Ordered Into Unsupervised Contact With an Abusive Parent After Divorce?* (2008); Center for Judicial Excellence, U.S. Divorce Child Murder Data (Last updated, April 8, 2021).

[16] Joan S. Meier, A Historical Perspective on Parental Alienation Syndrome and Parental Alienation, 6 GWU J. Child Custody 232 (2009).

[17] "Parental Alienation Syndrome (PAS) – Valid Theory or Debunked Sham?", Cullen Family Law Group, available at: https://www.lawcullen.com/family-law-newsletter-archives/parental-alienation-syndrome-pas-valid-theory-or-debunked-sham/.

[18] Hannah Summers and Beatrix Campbell, "Parental alienation and the unregulated experts shattering children's lives," The Guardian, June 12, 2022, available at: https://amp.theguardian.com/global-development/2022/jun/12/parental-alienation-and-the-unregulated-experts-shattering-childrens-lives.

alleged alienating parent to the alienated parent is disfavored among most child mental health professionals"[19] but still used by government social workers and departments.

### Parental Alienation Allows for Discrimination

Richard Gardner, who created the theory of parental alienation, did so to target what he called pathological mothers: "Central to his thesis was his unfounded belief that allegations of child abuse that arise in the context of family court proceedings are fabricated by pathological mothers seeking 'the total elimination of the father.'"[20] Judges have decried this gender-based focus: "This gender-biased generalization is ludicrous and an affront to all reasonable women and men."[21] Yet it continues.

The Johnson Law Group reports that mothers are "twice as likely" to be charged with alienation.[22] "Alienation virtually doubles the rates of mothers' custody losses while halving the rate at which mothers' abuse claims are believed."[23]  Indeed, "[t]he overwhelming evidence suggests that court decisions are often informed by gender biases and incorrect assumptions about women's motivations for disclosing abuse and advocating for their children's protection. In a nationwide study of over 4000 cases, courts believed women only 21% of the time when they alleged child physical abuse and 19% of the time when they alleged child sexual abuse…. Even

---

[19] "Parental Alienation Syndrome (PAS) – Valid Theory or Debunked Sham?", Cullen Family Law Group, available at: https://www.lawcullen.com/family-law-newsletter-archives/parental-alienation-syndrome-pas-valid-theory-or-debunked-sham/.

[20] "The 'Parental Alienation' Defense Endangers Children," Child USA: The National Think Tank for Child Protection, (Apr. 8, 2021).

[21] *Hanson v. Spolnik*, 685 N.E.2d 71, 84 (Ind. Ct. App. 1997) (Chezem, J., dissenting and concurring in result).

[22] Most Common Examples of Parental Alienation in Colorado 2023," Johnson Law Group, May 12, 2023, available at: https://johnsonlgroup.com/examples-of-parental-alienation-in-colorado/#:~:text=A%3A%20Colorado%20recognizes%20that%20alienating,lose%20custody%20of%20the%20child.

[23] "The 'Parental Alienation' Defense Endangers Children," Child USA: The National Think Tank for Child Protection, (Apr. 8, 2021); *See also* Meir, J., et. al., *Child Custody Outcomes in Cases Involving Parental Alienation and Abuse Allegations* (2019), GWU Law School Public Law Research Paper No. 2019-56.

when the father's abuse is proved in the court, mothers lost custody to the proven abuser 13% of the time."[24]

The Cullen Family Law Group also reports: "Proponents of the [parental alienation] theory, many of them fathers and their attorneys, used the theory to discredit the other parents' allegations of child abuse by introducing the concept into the custody case and saying PAS was the real reason behind the child's behavior towards the alienated parent. Opponents of the theory perceived it as a red herring, often used to deflect attention away from the allegations of abuse" – most often reported by mothers.[25] Mothers, in particular, also "reported they had lost their homes and life savings during lengthy court battles that ultimately resulted in the removal of their children."[26] The Presidential Task Force of the American Psychological Association on Violence in the Family found way back in 1996 that "a]lthough there are no data to support the phenomenon called parental alienation syndrome, in which mothers are blamed for interfering with their children's attachment to their fathers, the term is still used by some evaluators and Courts to discount children's fears in hostile and psychologically abusive situations."[27] Not much has changed.

Jeffrey Edleson, PhD, Director of the Minnesota Center Against Violence and Abuse, and Professor and Director of Research at the University of Minnesota School of Social Work explains that parental alienation "still allows what PAS tends to do when it's raised, which is to

---

[24] "The 'Parental Alienation' Defense Endangers Children," Child USA: The National Think Tank for Child Protection, (Apr. 8, 2021); Silberg, J., et al., *Abusers Gaining Custody in Family Courts: A Case Series of Over Turned Decisions*, 16(2) J. OF CHILD CUSTODY 140, 151-52 (2019).
[25] *See* Cullen at Footnote No. 2.
[26] Hannah Summers and Beatrix Campbell, "Parental alienation and the unregulated experts shattering children's lives," The Guardian, June 12, 2022, available at: https://amp.theguardian.com/global-development/2022/jun/12/parental-alienation-and-the-unregulated-experts-shattering-childrens-lives.
[27] Report of the American Psychological Assocaition Presidential Task Force on Violence and the Family. Washington, D.C.: APA (1996).

undermine claims made by the mother. And yet the data show that the claims of domestic and sexual abuse being made by mothers are generally truthful."[28] Furthermore, "there is no reputable research to support the notion that children can be brainwashed to believe that they have been abused when they have not. In fact, in instances of abuse or neglect, research suggests that children's recollections of the events carry greater accuracy and are largely resistant to suggestibility."[29]

Even beyond the evidence that suggest parental alienation is most often targeted against mothers is the evidence that parental alienation discriminates against parents based on their marital status. Because parental rights are a fundamental constitutional right, the taking of such a right must be evaluated under a strict scrutiny analysis. And, discriminating against a person based on their marital status cannot withstand strict scrutiny. The marital status discrimination is clear because parental alienation is only used as a theory to strip parents of their parental rights *during or after divorce cases*. While the department of social services, law enforcement, or other branches of government can interfere in the parent-child relationship and act to terminate parental rights for physical or sexual abuse, regardless of marital status, they cannot and do not do so in cases of parental alienation unless the parents are divorced or divorcing. Only a divorced parent may have their parental rights terminated because they make disparaging comments or false accusations against the other parent, undermine the authority of the other parent, fail to co-parent, or even manipulate their child to dislike the other parent.[30] Anyone who thinks these actions do not occur among married parents has never listened to couples in a marriage

---

[28] David Surface, *Revisiting Parental Alienation Syndrome – Scientific Questions, Real World Consequences*, 9 Social Work Today No. 5 (Sept/Oct. 2009).
[29] "The 'Parental Alienation' Defense Endangers Children," Child USA: The National Think Tank for Child Protection, (Apr. 8, 2021).
[30] *See* Dr. Emma Bale, "7 Reasons Parents Lose Custody for Parental Alienation," Cipro Family, May 9, 2023, available at: https://www.ciprofamily.com/parent-lose-custody-for-parental-alienation/.

counseling office. Clearly, married parents unfortunately engage in these behaviors as well, but they are never subject to having their parental rights terminated for "emotional abuse" and "parental alienation" even if and when they engage in the *exact same behaviors*. As Professor Hagemeister explains, "PAS in the courtroom has become just another part of the whole adversarial system that's been constructed. It becomes an adversarial tool rather than a therapeutic one."[31]

In addition to discriminating against divorced parents and specifically single mothers, parental alienation also discriminates against children of divorced parents – with many similar hallmarks to how illegitimate children were treated before *Levy v. Louisiana*[32] changed the standard: different and inequal treatment based on the family status. Only a child of divorced parents may suffer the injury of being taken – permanently – from the parent they favor and given to the parent they do not have a good relationship with. As Professor Brown says, "You still have to look at the carnage on the other end: the intentional destruction of family relationships, women and children being railroaded through the court system for years. People have got to take a position on this. The cost is human life."[33]

## Parental Alienation Provides the Basis for the Unconstitutional Taking of Fundamental Rights

In the name of punishing one parent who state agencies or a court believes have damaged a child's relationship with the other parent, the government steps in and does the exact thing they

---

[31] David Surface, *Revisiting Parental Alienation Syndrome – Scientific Questions, Real World Consequences*, 9 Social Work Today No. 5 (Sept/Oct. 2009).
[32] citation
[33] David Surface, *Revisiting Parental Alienation Syndrome – Scientific Questions, Real World Consequences*, 9 Social Work Today No. 5 (Sept/Oct. 2009).

are punishing the favored parent for doing: they actively and intentionally break a child's relationship with a parent who loves a child. Recently, the government officials who use parental alienation in this way have been named "the unregulated experts shattering children's lives."[34] Children who want to stay with a particular parent are told "their wishes were attributed to their mother's 'brainwashing,'"[35] and they are yanked – permanently from the mother they have always known.

In sum, parental alienation allows the government to disregard the need for a child to have a relationship with two parents. It allows the government to completely kick one parent out of a child's life – sometimes for nothing more than speaking badly about the other parent in the middle of a messy divorce. This amounts to a taking of a fundamental constitutional right based on speech – which implicates another taking: the taking of the right to free speech. According to Andraé L. Brown, PhD, Assistant Professor at Lewis and Clark College, and Codirector of the Affinity Counseling Group: "If the father does something abusive to the child or the mother, the mother can't report it because she's already been identified as having parental alienation syndrome. Therefore, anything she says along those lines cannot be introduced in the court. Her statements are interpreted as further evidence of PAS."[36] In effect, the government officials compel the mother's speech in order to keep her parental rights. If she fails to comply, her parental rights are terminated permanently. If she does comply, her right to free speech and her right to parent her children as she chooses – to include reporting abuse committed by their father – is taken from her. Multiple publications by the American Psychological Association over at

---

[34] Hannah Summers and Beatrix Campbell, "Parental alienation and the unregulated experts shattering children's lives," The Guardian, June 12, 2022, available at: https://amp.theguardian.com/global-development/2022/jun/12/parental-alienation-and-the-unregulated-experts-shattering-childrens-lives.
[35] *Id.*
[36] David Surface, *Revisiting Parental Alienation Syndrome – Scientific Questions, Real World Consequences*, 9 Social Work Today No. 5 (Sept/Oct. 2009).

least thirty years have condemned the use of parental alienation as way to stop allegations of abuse in families – which is an exercise of free speech for a parent who believes abuse has occurred.[37]

While the Supreme Court has laid out the standard for terminating parental rights as "clear and convincing evidence,"[38] the termination of rights based on parental alienation often amounts to opinions, not evidence at all. Since parental alienation is an emotional issue – and it occurs in the middle of an emotional upheaval that a child is already experiencing during her parents' divorce – the view that one parent is causing psychological damage and turning the child against the other parent is all too often subjective. Multiple experts could and would come to different conclusions, but the favored parent often does not have the funds to hire their own experts. The "clear and convincing evidence" is difficult to meet during accusations of physical and sexual abuse, much less the "emotional abuse" of parental alienation. A psychological evaluation should hardly be sufficient to permanently strip a parent's rights – particularly since, in many states, the rights are impossible to win back. For example, Colorado only allows a single appeal of permanent termination within 21 days. This provides no opportunity for a parent who may be alienating a child from the other parent in the middle of an emotionally difficult divorce to get therapy and counseling for a few months or a year and come back to demonstrate they are a healthier person who should have their parental rights restored. This lack of opportunity for restoration is particularly destructive since there is no reason for the opportunity to be unavailable. In parental alienation cases, it is nearly always one biological parent who receives

---

[37] *See, e.g.*, American Psychological Association, Report of the American Psychological Association Presidential Task Force on Violence and the Family (1996); American Psychological Association, Statement on Parental Alienation Syndrome (2008); Rebecca Clay, *Inappropriate assumptions are common in family court*, Monitor on Psychology, July 2014, at 34.

[38] *Santosky*.

full custody; the children are not adopted. Restoring the other biological parent after counseling or therapy would be entirely possible if the law allowed – or better yet, required – it.

Parental alienation is an unconstitutional taking of the fundamental right of a parent to raise their child, the fundamental right to speech, and the fundamental right of a child to stay with a parent.

### **The Termination of Parental Right is Not the Only Solution for Parental Alienation**

The results that comes from a determination of parental alienation are deeply damaging. "In theory, the goal [should be] a more realistic and healthy relationship with both parents, rather than reconciliation with the hated parent as the only desirable goal (Johnston, 2005). Unfortunately, the common practice in court is far less nuanced and individualized,"[39] and often the termination of one parent's rights results in children being given only and fully to a parent they hate – regardless of the reason for the hatred.

Too often, parental alienation results in the complete termination of parental rights. The parent loses all contact with the children who currently love and count on them and the children are thrown into the lap of a parent who they feel estranged from and, in many cases, has abused them physically or sexually. Colorado's application of parental alienation is very severe and results in permanent termination.

If parental alienation were not a retributive and discriminatory legal theory, much lesser measures could result from its usage. For example, a parent accused of alienating children from the other parent could be ordered to share custody or to go to personal or family therapy or counseling. Both of these measures could be more than adequate and could result in a restoration

---

[39] Joan S. Meier, A Historical Perspective on Parental Alienation Syndrome and Parental Alienation, 6 GWU J. Child Custody 232 (2009).

of the relationship between the child and the unfavored parent. Using parental alienation to terminate parental rights does not solve the problem of a child having only one parent; it exacerbates the problem and leads to greater confusion and loss for the child caught in the middle as the termination of rights strips them away from the one parent they believe loves and understands them. This discriminatory practice is unconstitutional and inequitable and should end.